[Nos. A118303, A118679. First Dist., Div. Three. Sept. 30, 2008.]

PENINSULA GUARDIANS, INC., Plaintiff and Appellant, v. PENINSULA HEALTH CARE DISTRICT et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Background part B., "Litigation Phase" and Discussion, part B. and part C.

76

## COUNSEL

Meyers, Nave, Riback, Silver & Wilson, David W. Skinner, Joseph M. Quinn; Curtis, Green & Furman and Mitchell J. Green for Plaintiff and Appellant.

Archer Norris, Douglas C. Straus and Mark A. Olson for Defendant and Respondent Peninsula Health Care District.

McDonough Holland & Allen, Harriet A. Steiner and Kara K. Ueda for Defendant and Respondent Mills-Peninsula Health Services.

## OPINION

**JENKINS, J.**—Plaintiff Peninsula Guardians, Inc. (plaintiff), an incorporated public interest group, filed suit against defendants Peninsula Health Care District (the District) and Mills-Peninsula Heath Service (MPHS) alleging

(1) the District exceeded its powers under Health and Safety Code section 32126 (section 32126) by negotiating a 50-year ground lease with MPHS so that MPHS could build a new hospital on property owned by the District; and (2) the District made illegal campaign expenditures under Government Code section 54964 (section 54964) in connection with a special election held in order to secure voter approval for the hospital project.

Plaintiff's appeal follows the trial court's dismissal of the complaint after sustaining defendants' demurrers on plaintiff's section 32126 claims, granting summary judgment on plaintiff's remaining section 54964 claim against the District, and denying plaintiff's motion for relief from summary judgment under Code of Civil Procedure section 473 (section 473). We affirm the trial court's orders sustaining defendants' demurrers on the section 32126 claims and granting summary judgment on the section 54964 claim. However, we reverse the trial court's section 473 ruling, vacate the judgment and remand for plaintiff to amend its complaint in the manner described herein.

BACKGROUND

A. *Prelitigation Phase*

In 1985, the District and MPHS each owned an acute care hospital serving residents of the District. Seeking to improve both services and efficiencies, the District and MPHS agreed to merge the operations of the two hospitals. As part of that agreement, the District leased its existing hospital facility to MPHS in 1985, with the lease to expire in January 2015 and full fee ownership and control of the existing hospital to revert to the District at that time.

During the term of the lease on the existing hospital, the State of California adopted strict seismic standards for acute care hospitals. Implementation of the seismic standards meant that the existing hospital would require substantial modifications. Based on engineering studies, the District and MPHS concluded that compliance with the seismic standards would be better achieved by the construction of a new hospital facility rather than a retrofit of the existing facility. To this end, the parties entered a "Restructured Relationship Pre-closing Agreement" (Pre-closing Agreement), under which MPHS would develop, construct, and operate a new general, acute care hospital on roughly 21 acres of land leased from the District as owner of the property.

The Pre-closing Agreement was incorporated in a series of interrelated written agreements, collectively termed the "Definitive Agreements." The

Pre-closing Agreement itself governed the relationship between the District and MPHS during the interim between the time the parties actually execute the Definitive Agreements and the closing date after voter approval. It covered such matters as the completion and execution of the Definitive Agreements, the parties' obligations regarding the election and securing voter approval for the proposal, and the parties' obligations regarding financing and the existing lease prior to the specified closing date. Key here among the Definitive Agreements are the "Master Agreement" and the "Ground Lease."[1]

The Master Agreement contains the general terms that govern the relationship between the parties and coordinates all the other agreements where provisions overlap. The Master Agreement also sets forth the parties' rights and obligations regarding the operations of the new hospital and provisions concerning the development and future uses of the new hospital. Under the terms of the Master Agreement, MPHS undertook to design, finance, and build the new hospital, demolish the existing hospital and return the site to the District, all at no cost to the District. It provides that MPHS shall own and operate the hospital during the term of the Ground Lease.

The Ground Lease sets forth the contractual terms governing a 50-year lease of the District's land to MPHS for the purpose of building and operating the new hospital facility. The term of the lease commences when MPHS begins to operate the new hospital (Start Service Date) and may be extended for an additional 25-year period upon MPHS's request and the District's written consent. During the term of the Ground Lease, MPHS will pay annual rent to the District in the amount of $1.5 million, adjusted for inflation every three years. The Ground Lease further provides that MPHS shall use the premises only "for the purpose of maintaining and operating a general acute-care hospital and performing such other healthcare-related services in accordance with the Master Agreement." It also specifies that during the term of the lease and any extension thereto, MPHS will hold ownership to the new hospital facility and associated improvements. Also, the Ground Lease provides that upon expiration of the lease term the new hospital automatically becomes the property of the District and the District must compensate MPHS at book value for certain "Post-Term Assets" as specified in the Ground Lease.

---

[1] Also included in the Definitive Agreements are the "Construction Ground Lease" and the "Construction Agreement." The Construction Agreement only covers the construction phase, governing such matters as indemnity insurance during construction, default provisions, and provisions for termination. The Construction Ground Lease essentially coordinates the ongoing lease of the existing hospital premises with lease of the ground necessary for the construction of the new facility.

Under the terms of the Pre-closing Agreement, the District was obligated to hold an election on a ballot measure asking the voters to approve the District's entry into the Master Agreement with MPHS. The Pre-closing Agreement stated: "Both parties, at their own expense and within the limitations and parameters imposed by any law . . . that governs the parties' respective political activities, . . . shall reasonably support the Ballot Measure and use reasonable efforts to obtain Voter Approval."

Pursuant to the terms of the Pre-closing Agreement, a special election was scheduled on a ballot measure (Measure V) to allow voters the opportunity to accept or reject the District's entry into the Master Agreement. The District devoted its six-page summer 2006 newsletter to Measure V. The newsletter states:

"Dear District Resident, [¶] The [District] Board is proud to announce that after many years of study and planning, we are ready to present our agreement to build a new community hospital to the District voters in a special mail-in ballot election this August. [¶] Last fall, the District Board unanimously approved an agreement with [MPHS], the current operator of Peninsula Medical Center, to build a new $488 million modern medical campus on District land with no new taxes. As part of this new lease, MPHS will pay $1.5 million a year to the District in rent for the use of that land for the 50-year term of the lease, after which time the hospital will be transferred back to the District. The District will reimburse MPHS with the book value of the new hospital, a substantial discount, at the time of this transfer. [¶] Because the current hospital does not meet the newly adopted, state-mandated seismic safety requirements, which must be met by 2013, the District Board is eager to present this agreement to the District voters· for approval in order to avoid further cost escalation and to keep construction on budget and on schedule. If the new seismic standards are not met by the deadline and a new medical facility is not built, the Peninsula Medical Center would be forced to shut down, greatly limiting access to quality health care in our community. [¶] We would like to thank all of you who took the time to attend our special Board meetings which were held throughout the District and to those of you who provided feedback on the draft agreement this past fall. [¶] The negotiations have been extensive and with your input and participation, we have negotiated the best possible agreement for the District. We will get a new hospital, and a framework for providing for the health care needs of the people of the District for generations to come."

The remainder of the summer 2006 newsletter devotes sections to various aspects of Measure V, including the details of the Master Agreement (p. 2);

the construction timeline and the hospital's expected completion in early 2010 (p. 3); the reason the District needs a new hospital, viz., the new seismic requirements for acute care medical facilities (p. 4); how the mail-in ballot works, including when voters should expect to receive their mail-in ballots (p. 6); and the "new hospital for the next century," setting out the features and facilities included in the new hospital campus (p. 5).

During the runup to the election, the District sent three additional postcard-sized mailers to voters concerning Measure V. One is headed "What is Measure V?" It explains that the District and MPHS have reached an agreement for the construction of a new hospital on District land, and that the current hospital will be forced to close down if it does not comply with new seismic standards. Under the subheading, "Measure V Will Ensure" the mailer lists four bullet points on the key terms of the agreement struck between the District and MPHS. The four points listed are that MPHS will build a new hospital meeting seismic standards with no new taxes; the District will lease the site for the hospital to MPHS at rent of $1.5 million per year for the 50-year term; the District "will improve its oversight over hospital operations with its required approval of the removal of any core services"; and the District will have the option to acquire the hospital at the end of the lease at book value.

A second mailer is headed "How the Mail-In Ballot Works." It tells voters there will be no polling places and that once voters receive their ballots in the mail they should fill them in and return them by August 29, 2006, either by mail or to the 24-hour drop box outside the election office. It also restates the four bullet points listed in the first mailer. A third mailer is headed "Don't Forget to Vote." It too reminds voters that ballots must be returned by August 29, 2006, and restates the four bullet points. On August 29, 2006, Measure V was approved with 92.82 percent of the votes cast in favor of the measure.

B. *Litigation Phase*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 75.

DISCUSSION

A. *Section 32126 Claims*

   1. *Applicable Standards*

The trial court sustained the District's and MPHS's demurrers to plaintiff's section 32126 claims without leave to amend. The appropriate standard of review of that ruling is as follows: "When reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, courts must assume the truth of the complaint's properly pleaded or implied factual allegations. [Citation.] Courts must also consider judicially noticed matters. [Citation.] In addition, we give the complaint a reasonable interpretation, and read it in context. [Citation.] If the trial court has sustained the demurer, we determine whether the complaint states facts sufficient to state a cause of action. If the court sustained the demurrer without leave to amend, as here, we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect. [Citation.]" (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569].)

The relevant statutory language governing the issue of whether plaintiff's complaint states facts sufficient to state a cause of action under section 32126 is as follows: "The board of directors may provide for the *operation and maintenance through tenants* of the whole or any part *of any hospital acquired or constructed* by it pursuant to this division, and for that purpose may enter into any lease agreement that it believes will best serve the interest of the district. . . . *No lease for the operation of an entire hospital shall run for a term in excess of 30 years.* No lease for the operation of less than an entire hospital shall run for a term in excess of 10 years." (§ 32126, subd. (a), italics added.)

█ Based on competing interpretations of the statutory language, the parties dispute whether the District's Ground Lease with MPHS is subject to the statute's 30-year lease restriction. Accordingly, we first examine the statutory language to determine whether its meaning is plain or the statute is ambiguous. (*Fitch v. Select Products Co.* (2005) 36 Cal.4th 812, 818

[31 Cal.Rptr.3d 591, 115 P.3d 1233] [stating that under "well-established principles" of statutory construction, "[i]f the plain, commonsense meaning of a statute's words is unambiguous, the plain meaning controls"].) We will then address the parties' competing interpretations to determine whether plaintiff can plead a meritorious claim consistent with our own interpretation of the statute.

■ Section 32126 allows a board of directors to "provide for the operation and maintenance through tenants of the whole or any part of any hospital acquired or constructed by it." (§ 32126, subd. (a).) "[F]or that purpose[,] [the District] may enter into any lease agreement that it believes will best serve the interest of the district." (*Ibid.*) Further, the length of any such lease agreement is determined by whether the board chooses to delegate the operation and maintenance of its hospital to a tenant in whole or in part: If the entire operation and maintenance of its hospital is delegated to a tenant, then the maximum term of the lease the board may enter into is 30 years, as reflected in the statutory language, "No lease for the operation of an entire hospital shall run for a term in excess of 30 years."

■ On their face, these provisions clearly and unambiguously authorize a district board to enter a specific type of lease—one that provides (1) for the operation and maintenance through tenants of a hospital (2) acquired or constructed by the District. The statute also places a clear and unambiguous restriction on the power of the board to enter such a lease—"No lease for the operation of an entire hospital shall run for a term in excess of 30 years." The plain language of this lease restriction, however, must be construed " ' " '*in the context of the entire statute* . . . and the statutory scheme of which it is a part[,] [giving] " '. . . significance . . . to every word, phrase, sentence and part of an act in pursuance of the legislative purpose . . .' [and construing] '. . . [words] . . . in context, keeping in mind the nature and obvious purpose of the statute where they appear.' " ' " ' " (*Santa Clara Valley Transportation Authority v. Public Utilities Com.* (2004) 124 Cal.App.4th 346, 359–360 [21 Cal.Rptr.3d 270], citations omitted; *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 582 [48 Cal.Rptr.3d 340] ["We do not examine . . . [statutory] language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment."].)

■ Applying these principles of statutory construction here, the Legislature's use of "no lease" in the lease restriction set forth in section 32126, subdivision (a) obviously relates to "the operation of an entire hospital" because the complete wording of the lease restriction reads as follows: "*No*

*lease* for *the operation of an entire hospital shall* run for a term in excess of 30 years." (Italics added.) When the entire lease limitation is itself considered in the context of the language of the subdivision as a whole, it is even clearer that the phrase "for the operation of any hospital" in the lease restriction relates back to earlier language that empowers a board to provide for the *"operation and maintenance through tenants of the whole or any part of any hospital* acquired or constructed by it pursuant to this division, and for that purpose [to] enter into *any lease agreement* that it believes will best serve the interest of the district." (§ 32126, subd. (a), italics added.) In short, a contextual analysis of the language of the statute makes clear that the lease restriction only applies if the predicate requirements of the statute are met—a board enters a lease (1) for the operation and maintenance through tenants of a hospital (2) acquired or constructed by the district.

■ In sum, when all the language of the statute is given full effect, construed as a whole and considered in context, it is clear that the Legislature intended to restrict the power of a board to enter a lease in excess of 30 years where two predicate requirements are met, i.e., when a board enters a lease providing for (1) the entire operation and maintenance through tenants of a hospital (2) acquired or constructed by the district.

2. *Analysis*

Plaintiff first contends that section 32126's lease restriction applies to *any* lease entered into by the District. Such a crimped interpretation does not comport with the plain meaning of the "no lease" provision when that provision, as explained above, is considered in the context of the section as a whole. Thus, we reject plaintiff's attempt to manipulate the "no lease" language to extend the reach of the 30-year lease limitation in section 32126 to *any* lease executed by the board.

Plaintiff contends that even if we conclude the statute mandates the existence of predicate requirements, the operative complaint alleges facts sufficient to establish such requirements and therefore the trial court erred by dismissing its claim under section 32126. In support of its fact-based argument, plaintiff asserts the Definitive Agreements as a whole establish that the Ground Lease involves a lease for the operation and maintenance of a hospital. Additionally, plaintiff asserts the Ground Lease involves a hospital "acquired" by the District because it provides the District will "acquire" the hospital at the end of the lease at book value. Upon testing the allegations in the complaint against the actual provisions set forth in the Definite

Agreements, however, we conclude the allegations fail to establish that the Ground Lease is one involving the operation and maintenance by a tenant of a hospital constructed or acquired by the District.

In the complaint, plaintiff alleges the Pre-closing Agreement outlined the terms of an agreement between the District and MPHS to settle then existing litigation, transfer certain properties, build a "state-of-the-art" hospital facility, and enter into a 50-year lease agreement. The terms of this agreement are embodied in the Definitive Agreements, including the Master Agreement and the Ground Lease. Plaintiff further alleges that if the Master Agreement is approved by the voters the "District is to lease the operation of its hospital for the next 50 plus years." Noting section 32126's lease restriction, plaintiff then alleges that "the Definitive Agreements implementing Measure V call for a lease that shall run for a term of over 50 years. . . ." The actual terms of the Definitive Agreements, however, refute plaintiff's assertion that the Definitive Agreements involve a 50-year lease for the operation and maintenance of a hospital acquired or constructed by the District.

First, the express terms of the Ground Lease demonstrate that it is *not* a lease for the operation or maintenance of a hospital. The Ground Lease provides that it does not come into effect until the Start Service Date under the Master Agreement, i.e., not until MPHS has completed the construction and begins operation of the new hospital facility. The Ground Lease further provides that, upon the Start Service Date, the District will lease the "Premises" to MPHS. The "Premises" are a certain portion of real property owned by the District in the City of Burlingame, which includes the site of the existing hospital grounds. A legal description of the Premises in metes and bounds is included in the Ground Lease, as well as a diagram showing the Premises as comprising 20.98 acres. Also, in its definition of the Premises, the Ground Lease specifically *excludes* improvements. In short, the terms of the Ground Lease demonstrate that it provides for the lease of District *land* to MPHS, not for the lease of a District hospital to be operated and maintained by a tenant.

Second, the Definitive Agreements demonstrate that the Ground Lease does not involve a hospital "acquired or constructed" by the District. The Master Agreement states that MPHS, *not the District*, "will design and build" a new general acute care hospital on roughly 21 acres of land leased from the District. It further provides that MPHS shall build the new hospital "in conformity with Seismic Standards . . . at no cost to the District." Moreover, the Master Agreement specifies that during the term of the Ground Lease,

*"MPHS shall own and operate"* the new facility. The Construction Agreement, consistent with the Master Agreement, also states that "MPHS will design and build" the new facility. It further provides that MPHS will demolish the existing hospital at its own expense and indemnify the District from all claims arising from *MPHS's construction of the new facility* and demolition of the existing hospital. Thus, the Definitive Agreements, when read as a whole or individually, do not support plaintiff's contention that the District leased a hospital acquired or constructed by it. On the contrary, the terms of the agreement establish that MPHS will construct the new facility and will "acquire" or own it for the 50-year duration of the Ground Lease.[6]

Plaintiff also contends that the District acquired and constructed a hospital within the meaning of section 32126 because upon termination of the Ground Lease the ownership of all improvements automatically become the property of the District. According to plaintiff, the District's *future* property interest in the new facility means the Ground Lease is *presently* subject to section 32126's lease restriction. However, we have already explained that the statute's lease restriction is not triggered unless and until certain predicate

---

[6] Plaintiff raises two additional contentions for the first time in its reply brief. First, plaintiff contends the District "constructed" a hospital merely because the District is constituted pursuant to, and exercises its powers under, The Local Health Care District Law (Health & Saf. Code, § 32000 et seq.). Second, plaintiff contends it must be conclusively presumed the Definitive Agreements pertain to a lease for the operation and maintenance of a hospital acquired or constructed by the District because the District submitted the project to the voters. Plaintiff bases this conclusive presumption on the fact that Health and Safety Code section 32121 *does not* require voter approval for a lease of the District's real property whereas section 32126 *does require* voter approval for the operation of 50 percent or more of a District hospital.

Plaintiff offers no explanation why these contentions were not presented earlier in its opening brief. Because arguments raised for the first time in the reply brief are considered untimely and may be disregarded by the reviewing court (see, e.g., *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364]), we deem these contentions forfeited. (See *Campos v. Anderson* (1997) 57 Cal.App.4th 784, 794, fn. 3 [67 Cal.Rptr.2d 350] ["Points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before."]; see also *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770] [noting that "[t]he California Supreme Court long ago expressed its hostility to the practice of raising new issues in an appellate reply brief"].)

Even if considered on the merits, the contentions are unavailing. On the first contention, plaintiff erroneously attributes controlling significance to the phrase "pursuant to this division" and ignores preceding language that the District's leasing powers apply specifically to "any hospital acquired or constructed" by the District. (See § 32126, subd. (a) [lease limitation applies to *"any hospital acquired or constructed* by [the District] pursuant to this division." (italics added)].) On the second contention, the fact the District held an election it may not have been required by statute to hold is irrelevant to the issue of whether the Definitive Agreements pertain to the operation and maintenance of a hospital acquired or constructed by the District.

requirements are met, viz., the lease must involve "the operation and maintenance through tenants of . . . any hospital acquired or constructed" by the District. (§ 32126, subd. (a).) At the point the Ground Lease expires the new hospital facility will be "acquired" by the District, but at that point there is no lease for the operation of a hospital by a tenant, only sole ownership of the hospital by the District. In short, the hospital's reversionary interest in a hospital constructed and acquired by MPHS does not trigger section 32126's 30-year lease restriction.

██ In sum, under the plain language of the statute, the lease restriction in section 32126 does not apply unless certain predicate requirements are present—viz., the lease involves the operation and maintenance through tenants of a hospital acquired or constructed by a district health authority.[7] Our interpretation is consistent with the statute's purpose of providing built-in oversight to the operations of district health authorities, an oversight that precludes any lease of publicly funded medical facilities in perpetuity and limits such leases to 30 years. The statute is not intended as a restraint on the alienation of *all* real property owned by a district health authority. Thus, because the complaint states no facts that would support a claim under our interpretation of the statute, we affirm the trial court's ruling sustaining defendants' demurrers to plaintiff's section 32126 causes of action.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The trial court's order sustaining the District's and MPHS's demurrers to plaintiff's first and second causes of action under section 32126 is affirmed. The trial court's order granting summary judgment to the District on plaintiff's fifth cause of action under section 54964 is affirmed.

---

[7] Because our ruling rests on the plain language of section 32126, we need not and do not conduct any analysis of the statute's legislative history. On that basis we deny as moot the requests for judicial notice filed by plaintiff on November 9, 2007, by MPHS on January 18, 2008, and deny in part as to exhibits A and B of the request for judicial notice filed by the District on January 24, 2008.

*See footnote, *ante*, page 75.

The trial court's order denying plaintiff's postjudgment section 473 motion is reversed and the trial court's judgment of May 25, 2007, is vacated. The case is remanded so that plaintiff may file an amended complaint alleging a claim against the District under *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]. The parties are to bear their own costs on appeal.

McGuiness, P. J., and Pollak, J., concurred.

On November 6, 2008, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied February 11, 2009, S168559. Werdegar, J., did not participate therein.